# IN THE UNITES STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

No. 14-3882

### MARK BALSOM, ET AL.

### PLAINTIFFS-APPELLANTS

### V.

### SECRETARY OF THE STATE OF NEW JERSEY

### DEFENDANT-APPELLEE

### APPEAL FROM THE UNITED STATED DISTRICT COURT FOR THE DISTRICT OF NEW

### JERSEY

(District Court No. 2-14-cv-01388)

## BRIEF AMICUS CURIAE OF FAIR VOTE

Stephen Loney
HOGAN & LOVELLS LLP
1835 Market Street, 29th Floor
Philadelphia, PA 19103
(267) 675-4677
Stephen.loney@hoganlovells.com

*Attorneys for FairVote*

## TABLE OF CONTENTS

Table of Contents ....................................................................... ii

I.    Statement of Interest .............................................................1

II.   Summary of Argument ...........................................................2

III.  Argument ..............................................................................3

   A.   The Evolution of Candidate Selection in the United States.......................6

    i.   The Origin of the Modern Primary  Election System ...............................6

    ii.  New Jersey's  Voting System ..................................................9

   B.   Elections Systems Available as Alternatives to Blanket Primaries .........10

    i.   Eliminating Nomination Systems : Louisiana Example ..........................10

    ii.  The "Firehouse Primary" and Ending State Funding of Partisan Primaries 14

    iii. The "Top Two" and The "Top Four" Primary Election .......................15

    iv.  The All-Independent Primary ...............................................17

v.  Each Option Above, and Potentially Many Others, Would Provide an Appropriate Remedy to Appellants .................................................................17

IV.  Conclusion ...................................................................................................18

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Balsam, et al. v. Guadagno*,
   No. 14-01388, at 6 (D. N.J. Aug. 14, 2014) ........................................................3

*Common Cause Indiana v. Indiana Sec'y of State*,
   1:12-CV-01603, 14-15 (D. Ind. Oct. 9, 2014) ....................................................4

*Common Cause Indiana*
   *v. Indiana Sec'y of State*, 1:12-CV-01603, at 15 ..................................................4

*Nixon v. Herndon*,
   273 U.S. 536 (1927) ............................................................................................4

*Smith v. Allwright*,
   321 U.S. 649 (1944) ............................................................................................4

*Terry v. Adams*,
   345 U.S. 461 (1953) ............................................................................................4

*Wash. State Grange v. Wash. State Rep. Party*,
   128 S. Ct. 1184 (2008) ......................................................................................18

STATUTES

LA. REV. STAT. §18:1306 (2013) ...........................................................................11

LA. REV. STAT. §§18:402, 18:481, 18:511 (2013) ..................................................11

LA. REV. STAT. §18:451 (2013) .............................................................................11

N.J.S.A. § 19:23-45 ................................................................................................9

OTHER AUTHORITIES

Alan Ware, *Anti-Partism and Party Control of Political Reform in the
   United States: The Case of the Australian Ballot*, 30 British Journal of
   Political Sci. 1, 11 (Jan. 2000) ............................................................................7

OAKLAND, CAL., CITY CHARTER art. 11, § 1105 (2008) .........................................12

S.F., CAL., CITY CHARTER art. 13, § 13.102 (2013) ..............................................12

Drew Spencer, The Top Two System in Action: Washington State, 2008-
        2012, FairVote (July 2013),
        http://www.fairvote.org/assets/WashingtonReport.pdf .......................................1

Editorial, *Our View: Open Primaries good, but ranked-choice better*,
        PORTLAND PRESS HERALD, June 24, 2014 .........................................................12

*Endorsers of Instant Runoff Voting*, FAIRVOTE,
        http://www.fairvote.org/reforms/instant-runoff-voting/endorsers-of-
        instant-runoff-voting/ ..........................................................................................12

FAIRVOTE, MONOPOLY POLITICS 2014, ch. 1, *available at*
        http://www.fairvote.org/assets/Redistricting2014.pdf .........................................5

Gary D. Allison, *Protexting Party Purity in the Selection of Nominees for*
        *Public Office: The Supremes Strike Down California's Blanket Primaries*
        *and Endanger the Open Primaries of Many States*, 36 Tulsa L.J. 59, 61
        (Fall 2000) ..........................................................................................................8

Graham Moomaw, *Democrats to Hold Firehouse Primary to Fill Marsh's*
        *Seat in Senate*, TIMES DISPATCH, Jul. 25, 2014,
        http://www.timesdispatch.com/news/latest-news/democrats-to-hold-
        firehouse-primary-to-fill-marsh-s-seat/article_8cf541d0-1426-11e4-a238-
        001a4bcf6878.html ............................................................................................15

Letter from the Oregon Secretary of State to All Interested Parties (Jan. 28,
        2014), Section 9(2), *available at*
        http://oregonvotes.org/irr/2014/055text.pdf ......................................................13

Malcolm Crook & Tom Crook, *Reforming Voting Practices in a Global*
        *Age: The Making and Remaking of the Modern Secret Ballot in Britain,*
        *France and the United States*, 212 Past & Present 199, 203–06 (August
        2011) ....................................................................................................................7

PORTLAND, ME., CITY CHARTER art. 2, § 3 (2012) ................................................12

Measure 90, in Oregon. Press Release, Oregon Secretary of State (Mar. 7, 2014), *available at* http://oregonvotes.org/irr/2014/055cbt.pdf ........................13

Minneapolis, Minn., City Charter § 5B (2014) .................................12

Nate Silver, *As Swing Districts Dwindle, Can a Divided House Stand?*, FiveThirtyEight (Dec. 27, 2012, 9:46AM), http://fivethirtyeight.blogs.nytimes.com/2012/12/27/as-swing-districts-dwindle-can-a-divided-house-stand/?_php=true&_type=blogs&_r=0 ...............5

Richard DeLeon & Arend Lijphart, *In Defense of Ranked Choice Voting*, Jan. 22, 2013, S.F. Gate, http://www.sfgate.com/opinion/ openforum/article/In-defense-of-ranked-choice-voting-4215299.php#photo-4069906 ...........................................................12

Richard H. Pildes, *Why the Center Does Not Hold: The Causes of Hyperpolarized Democracy in America*, 99 Cal. L.Rev. 273, 298 (Apr. 2011) ......................................................................................8

Rob Richie & Patrick Withers, California's Proposition 14: Weaknesses and Remedies, FairVote (August 2010), http://www.fairvote.org/research-reports/california-s-proposition-14-weaknesses-and-remedies/ .........................1

Rob Richie & Drew Spencer, *Fixing Top Two with Open General Elections: The Colorado Innovation*, FairVote (May 27, 2014), http://www.fairvote.org/research-and-analysis/blog/fixing-top-two-with-open-general-elections-the-colorado-innovation ...................................................2

Rob Richie, *Instant Runoff Voting: What Mexico (and Others) Could Learn*, 3 Election L.J. 501 (Aug. 2004), http://online.liebertpub.com/doi/ abs/10.1089/1533129041492150 .........................................................1

Tarini Parti, *Barbara Comstock Wins Virginia 'Firehouse' Primary*, Politico (Apr. 27, 2014), http://www.politico.com/story/2014/04/barbara-comstock-virginia-victory-106055.html ......................................................14

*Top Four Elections*, FairVote, http://www.fairvote.org/reforms/instant-runoff-voting/top-four-elections/ ......................................................16

*Top Four with Ranked Choice Voting*, FAIRVOTE (Aug. 2014),
    http://www.fairvote.org/assets/Policy-Guide/Top-Four-with-RCV-Policy-
    Brief.pdf ............................................................................................................ 16

William Safire, *Mulligan Primary*, N.Y. TIMES, Mar. 23, 2008,
    http://www.nytimes.com/2008/03/23/magazine/23wwln-safire-
    t.html?_r=3& ..................................................................................................... 14

## I.  STATEMENT OF INTEREST

FairVote is a 501(c)(3) non-profit organization incorporated in the District of Columbia whose mission is to advocate for fairer political representation through election reform. FairVote's mission is to uphold the power of every voter and rests on the belief that the use of ranked choice voting, cumulative voting, and other fair representation election methods will create a government that is more representative of the diverse views held in our society.[1] FairVote encourages public officials, judges, and the public to explore fairer and more inclusive election methods, including through litigation where appropriate.

FairVote has previously filed amicus curiae briefs in cases in a variety of cases. FairVote has published scholarly and popular articles critically analyzing various approaches to primary election reform. *See, e.g.*, Drew Spencer, The Top Two System in Action: Washington State, 2008-2012, FairVote (July 2013), http://www.fairvote.org/assets/WashingtonReport.pdf; Rob Richie & Patrick Withers, California's Proposition 14: Weaknesses and Remedies, FairVote (August 2010), http://www.fairvote.org/research-reports/california-s-proposition-14-weaknesses-and-remedies/; Rob Richie, *Instant Runoff Voting: What Mexico (and Others) Could Learn*, 3 Election L.J. 501 (Aug. 2004), http://online.liebertpub.com/doi/

---

[1] As used herein, "fair representation voting" refers to non-winner-take-all at-large elections that employ cumulative, single, or ranked choice voting. These systems are sometimes referred to as "alternative" or "modified" at-large voting systems.

abs/10.1089/1533129041492150; Rob Richie & Drew Spencer, *Fixing Top Two with Open General Elections: The Colorado Innovation*, FAIRVOTE (May 27, 2014), http://www.fairvote.org/research-and-analysis/blog/fixing-top-two-with-open-general-elections-the-colorado-innovation. Because of its familiarity with the benefits and drawbacks of primary election systems and beneficial reforms, FairVote is particularly well-suited to expound on this issue.

## II.     SUMMARY OF ARGUMENT

FairVote submits this brief to explain the wide variety of relief available to permit ballot access for independent voters whether or not closed primary elections continue to be held.  These plainly satisfy the legal theory of Appellants in this case while avoiding interference with the right of political parties to choose their own nominees.  Thus, FairVote respectfully contends that according the right to vote at all important stages of the electoral process does not necessarily infringe the rights of political parties to choose their candidates.

We note that, while publicly funded primary elections have been a part of U.S. electoral processes for many years, they are in fact abnormal both historically and internationally and plainly are not constitutionally required. Initially the creation of Progressive reformers during the early Twentieth Century, primary elections were originally intended to increase electoral competition and reduce the power of party

bosses and political machines.  Political scientists continue to debate the relative

impact of different primary elections on the political process.

State governments may (and indeed often do) use processes to determine access

to the general election ballot that both satisfy the legal theory promoted by the

Appellants to this case and that do not require private political party associations to

cede power over their nominations to non-members. Consequently, the lower court

erred in holding that Appellants' "entire lawsuit… proceeds from the premise that all

registered voters have a fundamental right to vote in the primary elections conducted

by political parties they are not members of." *Balsam, et al. v. Guadagno*, No. 14-

01388, at 6 (D. N.J. Aug. 14, 2014).  FairVote urges that this Court recognize that

Appellants' legal theory is not foreclosed by cases guaranteeing the rights of political

parties to allow only their members to participate in their nominating contests.

### III.    ARGUMENT

Appellants assert that the right to vote requires states to allow access to the

general election ballot only by a process that treats all candidates and voters equally,

irrespective of their membership in a major political party.  Recognizing that

individual voters' rights and political parties' associational rights necessarily must be

balanced, Appellants assert that the state may not fund and administer a public

election process that fails to protect both the major parties' associational rights and the

voters' right to cast a meaningful vote in the election of their representatives. Appellants' theory is not one that would dictate how primary elections should be conducted, but rather is a position on whether states can grant special privileges to political parties that infringe the right of independent voters to participate in meaningful elections.

Equally important is what is not before the Court: the question of whether the right to vote in primary elections may be altered when, as a matter of fact, the primary election will be the *only* meaningfully contested election. Decades of settled law stand for the proposition that the right to vote means that state actors cannot hide behind the guise of private association in order to exclude voters from the critical stage of an election – even if it is a nominating primary – that is the only meaningful election being held. *See generally Terry v. Adams*, 345 U.S. 461 (1953); *Smith v. Allwright*, 321 U.S. 649 (1944); *Nixon v. Herndon*, 273 U.S. 536 (1927); *see also Common Cause Indiana v. Indiana Sec'y of State*, 1:12-CV-01603, 14-15 (D. Ind. Oct. 9, 2014) (finding partisan nomination system for county judges unconstitutional as it effectively bypassed the general election). Consequently, in those elections in which the state chooses a general election method such that results of the general election are essentially preordained by the results of a primary election, states may not constitutionally exclude voters from the only meaningful election. *See Common*

4

Cause Indiana v. Indiana Sec'y of State, 1:12-CV-01603, at 15; see also FAIRVOTE,

MONOPOLY POLITICS 2014, ch. 1, available at

http://www.fairvote.org/assets/Redistricting2014.pdf (indicating that strongly partisan

districts limit competition to primary elections); Nate Silver, As Swing Districts

Dwindle, Can a Divided House Stand?, FIVETHIRTYEIGHT (Dec. 27, 2012, 9:46AM),

http://fivethirtyeight.blogs.nytimes.com/2012/12/27/as-swing-districts-dwindle-can-a-

divided-house-stand/?_php=true&_type=blogs&_r=0 (indicating that increasing

numbers of safe districts limit true electoral competition to the primary elections).

This issue has not been considered in an appellate court since the 1950s; however, it

represents a very different issue from that raised by Appellants, one that this Court

need not reach in resolving this appeal.

The District Court characterized the Complaint as an "attempt to use the

Constitution to pry open a state-sanctioned closed primary system."  Op. at 4.

FairVote believes that this is not an accurate reading of the relief sought in the

Complaint.  Rather, the Complaint seeks to balance the important rights of the

political parties and of voters who do not choose to become members of the major

parties.

Indeed, FairVote considers that there are several alternative methods that would

address Appellants' concerns while protecting political parties' established

5

associational rights.  FairVote submits this brief to highlight the wide variety of

methods available to states to decide access to the general election ballot in a way that

does not privilege the nominees of private associations but also does not require

private associations to "pry open" their nominating contests.

A. The Evolution of Candidate Selection in the United States

i. The Origin of the Modern Primary Election System

By framing Appellants' challenge as one asserting a right to participate in

primary nominating elections, the district court apparently assumed that such contests

are an immutable aspect of public elections. This assumption is divorced from the

majority of the American electoral experience.  Although enjoying wide use in

contemporary American voting systems, the taxpayer-funded nominating election is

actually a relatively recent development, and such a system is by no means

Constitutionally compelled or an inextricable aspect of our democracy.  The origins of

the current primary system date back to Progressive-era reforms, beginning at the turn

of the century, and most primary systems were not fully adopted until decades later.

Before primaries, elections were successfully conducted in the United States and

colonial America for more than 100 years in an entirely different manner.  Indeed,

even the concept of a government-printed general election ballot was unheard of for

much of American voting history.

6

There is no requirement for a government-printed ballot or a government-run primary; in fact, these features are largely late-Nineteenth and early-Twentieth-Century developments. Colonial and post-Revolutions elections were typically conducted using voice voting, voting using balls or marbles, or sometimes written ballots prepared by the individual voter. *See* Malcolm Crook & Tom Crook, *Reforming Voting Practices in a Global Age: The Making and Remaking of the Modern Secret Ballot in Britain, France and the United States*, 212 Past & Present 199, 203–06 (August 2011). Eventually, as political parties gained power and prominence, they began issuing their own written ballots to party members. Alan Ware, *Anti-Partism and Party Control of Political Reform in the United States: The Case of the Australian Ballot*, 30 British Journal of Political Sci. 1, 11 (Jan. 2000). These ballots typically featured only the party's candidates and provided a means for the party to encourage loyal voting. *See* Crook at 209. Concerns over the potential for abuse, fraud, and voter manipulation led to the adoption of a state-prepared secret ballot beginning in the late 1880s. Crook at 226. Known originally as the "Australian ballot," these ballots were state-provided ballots, available only at the polling place, not allowed to be removed from the polling place, and filled out by the voter in a private area. Crook at 228; Ware at 8. This ballot was intended to address many

7

perceived abuses of the party-controlled written ballots and remains the model for the modern ballot.

Once the government chooses to print the names of nominees on an approved ballot, it must develop some means of deciding who the nominees are. Although ballot access can be by petition or by a nonpartisan blanket primary, the norm became to continue to privilege political parties by printing only their nominees. At first, candidates continued to be hand-picked by party bosses in infamous "smoke-filled rooms." Gary D. Allison, *Protexting Party Purity in the Selection of Nominees for Public Office: The Supremes Strike Down California's Blanket Primaries and Endanger the Open Primaries of Many States*, 36 Tulsa L.J. 59, 61 (Fall 2000). However, to prevent potential abuses, reformers pushed for the direct selection of candidates through primary elections. *See* Ware at 2; Allison at 61; Richard H. Pildes, *Why the Center Does Not Hold: The Causes of Hyperpolarized Democracy in America*, 99 Cal. L.Rev. 273, 298 (Apr. 2011). The requirement that political parties nominate by election of their members was coupled with government funding of these elections in most places, both to ease the burden of the mandate on the parties and to ensure the security of the process from fraud. Out of these Progressive-era reforms came the modern primary election system, in which individual party members or others qualified to vote in the party's primary could cast ballots through state-

8

administered primary elections to select the party candidate who would appear as each party's nominee on the general election ballot, establishing the general framework for the election system still in place in the country today.

The primary election is thus best viewed as one out of many potential candidate-selection methods that was chosen to address specific problems associated with the candidate-selection process at the turn of the last century.

### ii. NEW JERSEY'S VOTING SYSTEM

New Jersey follows the general model put in place by the Progressive-era voting reforms.   As explained in Appellants' brief, for non-presidential elections, New Jersey uses a state-created Australian ballot and embraces a direct primary election paid for and overseen by the state, at least for the major political parties (currently, only the Republican and Democratic Parties are recognized by the state). New Jersey uses a so-called "closed" primary election in which only declared members of a political party may participate in that party's primary election.  N.J.S.A. § 19:23-45.  Because only the Republican and Democratic parties are eligible for a state-funded primary election in New Jersey, only Republican or Democratic registered voters may participate in the state's primary process.  Independent voters are denied access to any ballot in the primary.  *See id.*

9

New Jersey's current system is not, however, the only system capable of identifying nominees with an Australian ballot; numerous alternatives, some of which have already been adopted in other jurisdictions and have passed Constitutional scrutiny before the Supreme Court, are available to the state should the Appellants be granted the relief requested below.

B. ELECTIONS SYSTEMS AVAILABLE AS ALTERNATIVES TO BLANKET PRIMARIES

Although publicly funded primary nominating elections have reached a level of ubiquity in the United States, as history has shown, they are not the only option for candidate selection. There are numerous viable alternatives for elections systems which may address the issues raised by Appellants in this case. This brief examines four such alternatives.

i. ELIMINATING NOMINATION SYSTEMS : LOUISIANA EXAMPLE

States do not have to limit access to the general election ballot to one nominee from each political party. A common alternative practice would simply have each candidate petition to get directly onto the general election ballot, which may then include multiple candidates who affiliate with a single political party, with or without party labels.

10

One such system is already in use in Louisiana, where general elections are open to all candidates seeking office without any primary election. LA. REV. STAT. §18:451 (2013). In the event that no candidate receives a majority of votes in the general election, a runoff election between the two top performing candidates is held a month after the general election. LA. REV. STAT. §§18:402, 18:481, 18:511 (2013). Louisiana utilizes this method for all state and federal elections.

An additional element in Louisiana's system is the incorporation of ranked choice voting (RCV) for overseas voters in state and federal elections. LA. REV. STAT. §18:1306 (2013). RCV gives voters the ability to rank candidates on a ballot in their order of preference. Overseas voters are given RCV ballots to accommodate them in the event of a December runoff election. Ordinarily, overseas voters would be unable to submit a new ballot in time for a runoff election due to the short period between the general election and the runoff. RCV ballots allow those voters to participate in both elections by counting toward voters' first-ranked candidate in the general election and toward the highest ranking remaining candidate in any subsequent runoff election.

States could also readily adopt RCV as a stand-alone system with no primary elections. RCV serves as a useful alternative to avoid weak winners in vote-for-one plurality elections with larger numbers of candidates. Several large cities have already successfully adopted RCV and conducted single-round general elections. These cities

11

include San Francisco[2] and Oakland[3], California, Minneapolis, Minnesota[4], and Portland, Maine[5]. RCV has been regarded favorably and endorsed by numerous office-holders, political organizations, and advocacy groups. *See, e.g.*, Editorial, *Our View: Open Primaries good, but ranked-choice better*, Portland Press Herald, June 24, 2014, http://www.pressherald.com/2014/06/24/open-primaries-good-but-ranked-choice-better/; Richard DeLeon & Arend Lijphart, *In Defense of Ranked Choice Voting*, Jan. 22, 2013, S.F. Gate, http://www.sfgate.com/opinion/openforum/article/In-defense-of-ranked-choice-voting-4215299.php#photo-4069906; *Endorsers of Instant Runoff Voting*, FairVote, http://www.fairvote.org/reforms/instant-runoff-voting/endorsers-of-instant-runoff-voting/ (listing various people and organizations who have endorsed ranked choice voting).

Under RCV, voters are given the ability to rank all candidates in order of preference on their ballots. After all ballots are cast, all the votes are tallied based on voters' first choices. If one candidate receives a majority, that candidate is elected. If no candidate receives a majority, the worst performing candidate is eliminated and that candidate's supporters have their votes tallied for their second choices. This process continues until one candidate receives a majority of the remaining ballots.

---

[2] S.F., CAL., CITY CHARTER art. 13, § 13.102 (2013).
[3] OAKLAND, CAL., CITY CHARTER art. 11, § 1105 (2008).
[4] MINNEAPOLIS, MINN., CITY CHARTER § 5B (2014).
[5] PORTLAND, ME., CITY CHARTER art. 2, § 3 (2012).

RCV gives voters the ability to express their preferences to a greater degree than in

plurality elections and helps promote candidates with greater overall support within

communities.

In any system that eliminates nominating primary elections, including those in

Louisiana or an RCV system, issues arise concerning the ability of candidates and

parties to express their political affiliations or endorsements. One potential solution is

to give candidates and political parties the ability to indicate party affiliations and

endorsements on the ballot for an open primary; this solution was incorporated into a

2014 ballot initiative to adopt the "top two primary," Measure 90, in Oregon. Press

Release, Oregon Secretary of State (Mar. 7, 2014), *available at*

http://oregonvotes.org/irr/2014/055cbt.pdf. Although there would be no publicly

funded nominating primary elections, there would be indications of any current party

registration and which political parties have officially endorsed each candidate after

the candidates' names on the ballot. Letter from the Oregon Secretary of State to All

Interested Parties (Jan. 28, 2014), Section 9(2), *available at*

http://oregonvotes.org/irr/2014/055text.pdf. The Oregon initiative effectively balances

political parties' interest in choosing their candidate associations and the candidates'

interest in communicating their political ideology to voters. This solution could be

readily incorporated into any single-round election system as well, whether using the Louisiana system or RCV.

ii. THE "FIREHOUSE PRIMARY" AND ENDING STATE FUNDING OF

PARTISAN PRIMARIES

States may also avoid complaints relating to partisan primaries by simply cutting off public funding and returning to the privately-funded primaries, which were exclusively used until the early Twentieth Century. While states have the ability to require that parties nominate candidates through publicly-funded primaries, primaries could just as easily be funded by the private political parties which they benefit. Alternative nomination processes such as party conventions and caucuses are already used in Virginia and North Dakota. Another common option is the "firehouse primary." *See* William Safire, *Mulligan Primary*, N.Y. TIMES, Mar. 23, 2008, http://www.nytimes.com/2008/03/23/magazine/23wwln-safire-t.html?_r=3&.

In a firehouse primary, political parties hold private nomination proceedings in quasi-public spaces, such as community centers, firehouses or churches, rather than in official polling places. These types of private primaries have been used by both the Democratic and Republican parties in Virginia as recently as the 2014 congressional elections, with hardly any issues reported. *See* Tarini Parti, *Barbara Comstock Wins Virginia 'Firehouse' Primary*, POLITICO (Apr. 27, 2014),

14

http://www.politico.com/story/2014/04/barbara-comstock-virginia-victory-106055.html; Graham Moomaw, *Democrats to Hold Firehouse Primary to Fill Marsh's Seat in Senate*, TIMES DISPATCH, Jul. 25, 2014, http://www.timesdispatch.com/news/latest-news/democrats-to-hold-firehouse-primary-to-fill-marsh-s-seat/article_8cf541d0-1426-11e4-a238-001a4bcf6878.html. Firehouse primaries are beneficial in that they shift the bill from the state to the parties and alleviate voter concerns over funding private political activity, and modern technology, media scrutiny, and election monitoring would likely prevent the types of abuses of concern during the Progressive era from resurfacing. Of course, to satisfy Appellants' legal theory, this would have to be accompanied by an equivalent ballot access option for independent candidates, assuming it still provided the party primary winners with automatic designation on the general election ballot.

iii. THE "TOP TWO" AND THE "TOP FOUR" PRIMARY ELECTION

Another alternative is the elimination of publicly funded nominating contests and their replacement with two-stage election process: a "winnowing" primary election that does not elect any political party nominees but only eliminates the weakest candidates, followed by a general election between the strongest performing candidates.

15

The forms of this method used in Washington and California are referred to as "Top Two" because they eliminate all but two candidates after the first election. Nebraska also uses a "Top Two" two election method for its state legislative elections, but without the use of party labels. However, New Jersey could use this method while eliminating fewer candidates to ensure a more diverse and competitive general election that would still feature candidates from more than one political party any time such candidates ran serious campaigns.

One option is the "top four" primary, which adds two modifications to the top two primary. First, the top four candidates in the nonpartisan primary, rather than the top two, advance to the general election ballot. Second, the general election would be held using ranked choice voting, permitting voters to rank the four candidates in order of preference. A top four primary would help to combat the disproportionate advantages of major party candidates and incumbents while promoting competitive general elections and giving voters real choice over their representatives. *See Top Four Elections*, FAIRVOTE, http://www.fairvote.org/reforms/instant-runoff-voting/top-four-elections/; *Top Four with Ranked Choice Voting*, FAIRVOTE (Aug. 2014), http://www.fairvote.org/assets/Policy-Guide/Top-Four-with-RCV-Policy-Brief.pdf.

16

### iv. THE ALL-INDEPENDENT PRIMARY

Another alternative to the publicly-funded partisan primary is to extend publicly-funded primaries to independent voters through an "all-independent" primary. Currently, unaffiliated voters must choose to either not participate in primary elections, register with a recognized party to participate, or seek to nominate a candidate by petition or other onerous methods. Rather than compelling these voters to resort to affiliating with a party or alternative nomination methods, the state could simply hold an additional primary election. This "all-independent" primary would be open to any voter not registered as a member of either of the two major parties and permit them to vote for independent candidates or for the candidates of either major party. Unaffiliated voters would thereby have the ability to participate fully in both the primary and general election on equal terms with all major party voters.

### v. EACH OPTION ABOVE, AND POTENTIALLY MANY OTHERS, WOULD PROVIDE AN APPROPRIATE REMEDY TO APPELLANTS

Although the Complaint requests only that the current New Jersey primary election system be enjoined— thus allowing the state an opportunity to develop the compliant candidate selection system it deems most appropriate—each option discussed in this brief, and potentially many others, would address Appellants' concerns while also preserving the associational rights of political parties. The

17

Louisiana system, for example, does not provide automatic ballot access for any political party, addressing Appellants' Equal Protection concerns, while allowing parties to indicate whether they endorse a particular candidate. The "Firehouse" primary system removes the state from the business of directly funding and administering primaries, providing parties the ability to control their own nomination systems while eliminating the preferential status conferred to voters affiliated with dominant political parties. The "Top Two" primary has already passed Constitutional muster before the Supreme Court, *Wash. State Grange v. Wash. State Rep. Party*, 128 S. Ct. 1184 (2008), and the "Top Four" primary would likewise include similar Constitutional protections. Finally, the all-independent primary would provide equal treatment for voters not affiliated with the Republican or Democratic parties, curing the constitutional infirmity alleged in the Complaint, while continuing to allow the major parties to enjoy their closed primaries.

## IV.    CONCLUSION

For the foregoing reasons, this court should not conclude that Appellants to this case must lose because they seek to "pry open" New Jersey's closed primary election process. Although this court does not need to order a specific remedy, any of the alternative election systems discussed would provide an adequate remedy that would

both satisfy Appellants' legal theory while also allowing political parties to retain their

closed nominations.

Respectfully Submitted,

*s/Stephen Loney*
Stephen Loney
HOGAN & LOVELLS LLP
1835 Market Street, 29th Floor
Philadelphia, PA 19103
(267) 675-4677
Stephen.loney@hoganlovells.com

*Attorneys for FairVote*

19

**<u>Certificate of Compliance</u>**

Pursuant to Federal Rule of Appellant Procedure 32(a)(7)(C)(i), I hereby certify that this brief complies with the type-volume limitation identified in Rules 29(d) and 32(a)(7)(B).  The foregoing Brief contains 4,690 words, according to the word count function of the word-processing system used to prepare the brief.

**<u>Statement of Authorship</u>**

Pursuant to Federal Rule of Appellate Procedure 29(c)(5), FairVote hereby states that no party or party's counsel authored in whole or in part this brief; no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and no other person other than amicus curiae, its members, or its counsel contributed money that was intended to fund preparing or submitting this foregoing brief.

**<u>Local rule 31.1(C) Certifications</u>**

I certify that the text of the electronic brief is identical to the text of the ten paper copies mailed to the Court pursuant to Local Rule 31.1(b)(3).  I further certify that the electronic file of this brief was scanned with Metascan Online anti-virus software and that no virus was detected.

## **Certificate of Service**

I certify that on November 11, 2013, a true and correct copy of the foregoing motion was served on all parties to this appeal, via CM/ECF, pursuant to Third Circuit Rule 25.1(b), because counsel for all parties are Filing Users who will be served electronically by the Notice of Docket activity.

*s/ Stephen Loney*
Stephen Loney